Filed 9/9/14  In re S.Q. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re S.Q., a Person Coming Under the Juvenile Court Law. | B251773 (Los Angeles County Super. Ct. No. CK99726) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. KATE C., Defendant and Appellant. | |

APPEAL from findings and an order of the Superior Court of Los Angeles County.  S. Patricia Spear, Judge.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

Kate C. (mother) appeals from juvenile court jurisdictional findings and a dispositional order (Welf. & Inst. Code, §§ 300, 361)[1] regarding her daughter, S.Q. (S., born Mar. 2012). She contends that insufficient evidence supports the juvenile court's findings under section 300, namely that S. was at risk of harm. Thus, the juvenile court erred in removing S. from mother.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prior History with the Department of Children and Family Services (DCFS)*

This family consists of mother, S., and Dominic Q. (father).[2] On March 22, 2012, there was a referral for general neglect by the parents. The reporting party indicated that the parents got into an argument over mother's lack of caring for the baby and they shoved each other in S.'s presence. As part of its investigation, DCFS spoke with Dr. Green, who revealed that mother had been diagnosed with major depressive disorder with possible attention deficit hyperactivity disorder. Mother was in therapy and was stable. Because of their drug/alcohol related criminal history, the parents were asked to drug test; they refused. The referral was ultimately closed as inconclusive.

On July 30, 2012, DCFS was informed that the parents had been observed screaming, yelling, cursing, and slamming doors. Mother had been observed to be intoxicated and falling down. Father had been heard calling mother a "whore." The reporting party stated that there appeared to be constant conflict, yelling, and drinking. The neighbors were concerned about S.'s welfare. The referral was evaluated out.

*Paternal Grandparents Become Legal Guardians of S.*

Meanwhile, on June 19, 2012, the paternal grandparents obtained appointment as guardians of S. in probate court. Mother later disclosed that she was tricked into signing

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     Father is not a party to this appeal.

2

the paperwork so that the paternal grandparents could obtain health insurance for S. S., however, continued to live with mother and father.

*Protective Orders*

On August 28, 2012, mother reported that father had "'smashed'" her head against a television stand. She obtained a restraining order against him; the restraining order did not protect S.

After she obtained the restraining order, mother and S. moved out of the home they shared with father to the home of Michael C. (Michael), mother's former foster father (when she was a child).

On September 28, 2012, father, accompanied by the paternal grandparents, kicked down the door of Michael's home and took S. Michael called the police. He was advised to get a restraining order; thus, on October 24, 2012, mother obtained another restraining order against father.

*Termination of Legal Guardianship*

On April 22, 2013, the Los Angeles County probate court heard a petition by mother for termination of the guardianship. Over the paternal grandparents' objection, the petition was granted; S. was returned to the care and custody of mother.

It seems that after S. was returned to mother's care, they continued to live with Michael. But, mother would drop S. off at her paternal grandparents' home, where father would visit with her.

*Section 300 Petition and Detention*

This family came to the attention of DCFS again on May 23, 2013. According to the reporting party, on May 22, 2013, mother dropped S. at the paternal grandparents' home. S. had bruises on the top of her head and the middle of her cheek. Mother said that S. had fallen into the swimming pool. When the caller asked mother what had happened, mother screamed at the caller, saying that it was not his "'f—king business.'" The caller was advised to contact local law enforcement and ask if they could do a welfare check on S. Mother then called the paternal grandmother and told her that she

3

could no longer see S. when mother was at work or when she went out. They would no longer know how the child was doing.

Interview of Mother

On May 23, 2013, the social worker and Los Angeles Police Department Officers Wright and Bowman arrived at mother's home. The social worker observed a big bruise on S.'s forehead and a small scratch on her nose. Mother anticipated another bruise to show on S.'s cheek. Mother claimed that S. got the bruise on her forehead while she was in the care of the paternal grandparents five to eight days ago. Mother did not ask them how the injury occurred; she assumed it was from S. learning how to walk. Mother indicated that S.'s scratches and the expected bruise were caused by her falling at a "'kiddy pool'" at a friend's house two days earlier. S. lost her footing and hit her face on a brick.

Initially mother said that she had taken S. to the emergency room, where a doctor had taken x-rays and determined that S. was fine. Later, mother admitted that it was only a nurse who had seen the minor in the waiting room. Mother and S. then left because there was a long line. Mother could not explain why she had been untruthful.

Mother disclosed that she had been arrested for driving under the influence of alcohol in 2008. She was vague about her alcohol consumption, merely stating that she drank more when she was with father. She denied a current alcohol problem or that she had ever used drugs.

Mother admitted that she had been diagnosed with depression and was taking Wellbutrin and Adderall twice a day. Her psychiatrist was Dr. Paul Jaffe and she did not participate in therapy. She denied ever seriously considering suicide or having any current thoughts about suicide. She showed the social worker her medication. Mother had run out of Adderall and was going to get some soon. She also showed the social worker a full bottle of Wellbutrin prescribed by Dr. Jaffe on January 31, 2013. The prescription bottle stated that mother was to take the medication twice a day and that there were 60 pills in the bottle. When the social worker asked mother why the bottle was full and if she was taking her medication as prescribed (the medication should have

4

run out two months ago), mother claimed that that was her "'backup' bottle" and that she had just run out of medication in her other bottle. She planned to refill the prescription the following day. The social worker thought mother's explanation was unreasonable and believed that mother was not taking her medication as prescribed.

The social worker asked mother what childcare arrangements she planned to make since she was not going to let the paternal grandparents babysit. She claimed that she could work from home.

### Interview of Michael

The social worker also spoke with Michael. He said that mother had a bad relationship with father. Michael and his ex-wife also had a restraining order against father. Michael added that S. sustained the bruise on her forehead at the paternal grandparents' home a week ago and that the other injuries were caused by a fall at the pool. Michael did not remember what happened and did not have any concerns about mother's ability to care for S.

### Interview of Family Friend

Danielle T. (Danielle), a family friend, was present when S. fell. She confirmed that S. was playing at the inflatable pool when she fell and hit her face on the cement, against a brick. Danielle also stated that, at the time, S. already had a bruise on her forehead.[3]

### Interview of Father

Father told the social worker that the paternal grandmother had told him that mother dropped S. off with a bruise and a scratch. He called mother, but she did not tell him what happened. Instead, she "cussed [him] out." He denied S. sustained the injuries at the paternal grandparents' home.

According to father, the paternal grandparents were S.'s legal guardians until March 24, 2013, when the guardianship terminated. Mother had court-ordered visits

---

[3]     DCFS later conducted a child welfare search of Danielle and noted that in 2004, she lost custody of her child because of illicit drug use.

during the guardianship. Regarding the termination of the guardianship, the paternal grandmother "gave in" because she was dealing with medical issues.

Mother had been ordered by the probate court to drug test because she was abusing alcohol and crystal methamphetamine. Father did not know when mother had last used drugs because he was no longer in a relationship with her. When they were in a relationship about one year ago, mother was using crystal methamphetamine by adding it to her drinks. She would stay up all night. She would also drink an entire bottle of whiskey in one night and hide bottles of liquor around the home.

Mother illegally purchased Adderall, but it was later prescribed for her. Father had to terminate mother from his medical insurance because she was abusing his insurance by selling her prescribed Adderall over the Internet.

Father described mother as "'crazy.'" About one and one-half years ago, mother swallowed a "bunch of pills" because she wanted to kill herself. That night, mother went to the emergency room and obtained the medication she wanted. Another time, mother grabbed a kitchen knife and threatened to cut her wrists; father had wrestled the knife from her.

Father said that the paternal grandmother thought that lately mother looked sober. But, according to the paternal grandmother, during the past 10 days mother appeared depressed.

Regarding the restraining order, father explained that one night, mother came home drunk and refused to leave. He pushed her and she pushed him. Mother fell and hit her head, resulting in a mark. He denied that mother fell as a result of the push. After they calmed down, they went to the market and returned home. Mother dropped a soda can and father asked her to clean. They got into an argument and mother called the police. Because she still had the mark, the police arrested father. The police reported indicated that mother was drunk and that the mark was small. Later, in court, Michael told father "'f—k you,'" so father hit him in the courthouse.

Father had never met Danielle, but had heard that she illegally sold pills, including Vicodin and Adderall, to mother.

6

<u>Interview of Paternal Grandmother</u>

The paternal grandmother stated that mother and father were going through a divorce. In spite of mother's restraining order against father, she texted and called him "all the time." The paternal grandmother would babysit S. Monday through Thursday from 9:00 a.m. to 1:00 p.m., and on Sunday from 8:00 a.m. until 3:30 p.m. Mother told the paternal grandmother that she was working, but she refused to provide the address in case of emergency. Mother often returned two to three hours late to pick up S.

She stated that she released S. to mother's custody because dealing with the court was too stressful. Prior to that, the paternal grandmother had a legal guardianship over S. The probate court ordered mother to drug test because she had been using marijuana and abusing alcohol.

According to the paternal grandmother, mother had been using crystal methamphetamine since she was 12 years old. The paternal grandmother knew about mother's drug usage because she had a friend who used to work with mother. Mother was using and selling crystal methamphetamine.

When the parents resided together, mother drank whiskey every night until she passed out. Mother had tested negative for drugs in the two months prior to this referral; however, mother had missed three tests. She released S. to mother because they gave her the benefit of the doubt.

The paternal grandmother said that the parents were not stable. Father would get depressed and angry and would yell and scream. The parents fought when they lived together because of mother's drinking problem. The paternal grandmother witnessed only verbal fights, but she heard that they pushed and shoved each other.

According to the paternal grandmother, mother had multiple personalities and lied "a lot." She told the social worker: "'[Y]ou cannot believe a word she is saying.'" Also, mother had angry outbursts.

The paternal grandmother claimed that mother "was after" the money that father had received as a result of his biological father's death. She said that mother "used to go from one man to another" and had been molested by her stepfather when she was a child.

7

Mother was in foster care and her foster mother could not handle her because of her alcohol and drug problem; that is how mother ended up with Michael. Mother returned to Michael's home when she had nowhere to go.

The paternal grandmother reported that mother cut herself many times when she was living with father. She told the paternal grandmother about the cuts, and the paternal grandmother had observed them on mother's arms and legs. Mother's foster mother had also told the paternal grandmother that mother would cut herself as a child.

The paternal grandmother further stated that mother was suicidal and told her many times that she wanted to be dead. Mother attempted suicide twice—once she swallowed a "bunch" of Xanax; another time, she locked herself in the bathroom with a knife and threatened to cut herself.

Last year, mother told the paternal grandmother that she was selling Adderall to buy methamphetamine.

Most recently, mother brought S. to her home on a Wednesday. She noticed that S. had a bruise from her right nostril across her cheek all the way to her eye. She also had a big bruise on her forehead. The paternal grandmother noted that S. had just started to walk and had had bruises in the past, but they were not as "'drastic.'" Mother told the paternal grandmother that S. had fallen in a tiny, plastic "kiddy pool" and had bumped her head. Mother told the paternal grandmother that she had taken S. to the doctor, who prescribed Ibuprofen.

Initially, mother said that both bruises were caused by the fall at the pool. Later, she began to blame the paternal grandmother for the bruise on her forehead.

The paternal grandmother believed that mother had started drinking again. The prior Saturday, mother looked intoxicated and had glassy eyes. Mother had brought S. to the paternal grandmother's home, asking her to keep the child safe because she was a "'bad child.'" Mother was four hours late to pick S. up and looked "loaded."

Evaluation at UCLA

DCFS had S. seen at UCLA Medical Center, where a full skeletal survey was conducted. Dr. Choi reported that S. did not have any fractures. He found her injuries consistent with a fall.

Petition

On May 30, 2013, DCFS filed a section 300 petition on behalf of S. The petition alleged that the parents had a history of domestic violence; that the parents had mental and emotional problems, including depression; that father had a history of, and was a current user of, marijuana; and that mother had a history of marijuana and methamphetamine use and was an occasional abuser of alcohol.

Hearing

At the hearing, the juvenile court ordered S. detained from her parents and placed her with the paternal grandparents. The parents were granted monitored visits.

*Prerelease Investigation Report*

In the June 6, 2013, report, the investigator reported that despite mother's restraining order against father, she continued to call and text him. He said that he called mother after he received several text and telephone messages from him to call her. The dependency investigator looked at the text messages and listened to the rambling voicemail messages that mother left for father, including numerous obscenities and profanities describing the paternal grandmother and other individuals.

The dependency investigator noted that the paternal grandparents were S.'s legal guardians from June 19, 2012, through April 22, 2013. According to the paternal grandmother, the parents asked the paternal grandparents to obtain legal guardianship of S. because they acknowledged their inability to provide ongoing care and supervision of her. It was reported that the parents lacked conflict resolution skills and their arguments resulted in law enforcement responding to their home. The probate investigation concluded that the legal guardianship be granted to the paternal grandparents.

During the probate case, the paternal grandparents hired MCM Investigations to conduct surveillance of mother. Although mother denied drug or alcohol use, on

9

November 21, 2012, she was observed entering a bar at 10:50 p.m. and exiting the bar at 11:37 p.m. "'distraught and upset, staggering in her walk.'" Mother also had an erratic and unconventional schedule. She left home at approximately 1:30 a.m. and was going to different homes for only minutes at a time.

Mother informed the dependency investigator that the paternal grandparents obtained legal guardianship over S. through coercion. She denied that it was the result of the parents' tumultuous relationship and their substance abuse issues. Mother further denied suicidal ideation and/or suicide attempts.

*Jurisdiction/Disposition Report*

Interview of mother

In the June 21, 2013, report, the DCFS investigator reported regarding her interview of mother. Mother said that she had a restraining order against father. She accused him of being controlling.

Mother represented that she was compliant with her medication. However, she was unable to explain why she had abundant amounts of Wellbutrin if she was taking her medication as prescribed. She again denied suicidal ideation or threatening to commit suicide.

Mother also denied that she had a substance abuse problem. She agreed to submit to a random drug test.

Interview of father

The investigator spoke with father as well. He informed the investigator that mother continued to communicate with him, in violation of the restraining order. He played a voicemail message from mother, asking him to call her.

Father denied hitting mother. He admitted to pushing her. He claimed that she fell on the opposite side of where he pushed her. He denied that S. was in the home when he and mother fought. He had not participated in domestic violence counseling. He indicated that mother got angry and that he had anger problems as well.

Regarding mother's alleged suicide attempts, father stated that he took mother to Kaiser once because she tried to kill herself. On another occasion, he had to kick down

the bathroom door because she was threatening to kill herself. Mother liked to cut herself. Another time, mother had a gun and threatened to shoot herself. And yet another time, mother drank a bottle of bath salts. Father told mother that she did not want to kill herself; "'she was too much drama.'"

Father reported that mother smoked marijuana when she was with him, but that she stopped when she became pregnant. He explained that mother would drink alcohol. He found empty liquor bottles in the garage and around the house. When he came home from work one day, mother was sitting on the floor drinking a wine cooler during her pregnancy. A doctor told her that she could have one glass of wine, but she would drink bottles of hard liquor. When S. was born, he and mother agreed to sign over custody to his parents.

Father knew that mother used drugs because she drank iced tea with methamphetamine. She also abused her Adderall prescription. In fact, she asked father what he would say if she sold her Adderall on Craigslist.

Father noted that when mother was under the influence of drugs or alcohol, she slurred her words and smelled like alcohol. After S. was born, mother would drink, get sick, vomit, and then pass out on the bathroom floor. Father reiterated that the paternal grandparents had hired a private investigator who saw mother go to bars.

Interview of the paternal grandmother

The paternal grandmother stated that mother had a physical and violent side. Mother had punched her dog in the face. And, mother cut her arms and legs with a razor. One time, she got a knife and threatened to kill herself; she locked herself in the bathroom with the knife. Mother stayed up all night, did not sleep, and took more than her prescribed amount of Adderall.

When S. was seven weeks old, the paternal grandmother went to visit and found mother "stoned." Another time, the paternal grandmother had witnessed mother passed out in bed at 11:00 a.m., with a ball of marijuana and an empty Jack Daniels bottle.

<u>Restraining order</u>

Attached to the report was a copy of the October 24, 2012, restraining order that mother had obtained against father. That order expires October 24, 2015.

*Addendum Report*

In the August 23, 2013, addendum report, the dependency investigator reported that on August 13, 2013, father had been served with a new restraining order issued by the criminal court. Mother had cancelled her visit with S. in order to attend that hearing. Mother also failed to attend her August 21, 2013, visit with S.

Mother reported that she had submitted to two drug tests that yielded negative results. When asked about two missed drug tests (on July 3 and 16, 2013), mother responded that she had tested ever since she had been referred to testing. Then she added that she might have missed a day when she was out of town.

Mother represented that she completed an eight-hour online class regarding domestic violence.

The dependency investigator asked mother how she wanted the case resolved. Mother replied that she wanted custody of S., and then she wanted to move out of state or to England. The dependency investigator then asked about a parenting plan between her and father. Mother responded: "'I [will] be more cautious. I would have legal backing, like photos of her every time she visits.'"

The dependency investigator noted that mother had received a multidisciplinary assessment. The assessor wrote that mother had "received mental health support as a youth and as an adult at Didi Hirsch, and during this assessment discontinued psychiatric support from Dr. Jaffe at Kaiser Permanente, including her medication support." At the July 23, 2013, assessment meeting, mother said that she had fired her psychiatrist. She claimed that she had an intake appointment at Didi Hirsch.

The dependency investigator revealed other behavior and ideas that she characterized as "bizarre." While mother claimed to be Muslim, on May 26, 2013, she had S. baptized in a Catholic Church. She accused DCFS of violating her religious rights

12

and requested that S. be removed from the paternal grandparents' home and placed in a Sunni Muslim home.

When the dependency investigator asked mother if she had reconsidered signing a release of information to allow the investigator to speak with her psychiatrist, mother replied that she had obtained a copy of her medical records and needed to consult with her attorney before allowing the investigator to review the records. She did not want her mental health records used against her.

*August 23, 2013, Adjudication Hearing*

The juvenile court admitted various reports into evidence.

<u>Michael's Testimony</u>

Mother's former foster father, Michael, testified that mother had lived with him for one and a half years after she moved out of father's home. When S. was home, mother did not stay out late. He did not think that he saw mother intoxicated. She did not sleep all day. He was not home when mother worked. Mother had a three-year restraining order protecting her from father. He did not know if mother continued to contact father in violation of the restraining order.

When mother left father, she and S. lived with him until the paternal grandparents obtained custody of S. and father had "kicked in" his front door and removed the child from the home. S. returned to his home after the paternal grandparents' guardianship was dissolved.

He was not concerned about mother's parenting and would talk to her about any problems. He said that he would make a report if there were extreme problems.

He confirmed that mother was Muslim. S. had been baptized because mother learned that there was a discount at Catholic schools if a person was Catholic.

When mother was younger, she was diagnosed with attention deficit hyperactivity disorder and periodically took medication. He had not seen mother delusional in the last year and a half.

He did not see any injury from the "kidd[ie] pool" fall. Instead, he saw a previous bump. Mother had told him that the previous bump was from when S. fell down.

13

If S. were returned to mother's custody, Michael said that he would be somewhat involved in S.'s care. He would allow them to stay in a room in his home. Mother had friends with babies who would watch S. while mother was at work.

He did not know about the two prior DCFS investigations regarding mother and S.

Argument

During argument, S.'s counsel joined with DCFS's counsel. She noted that her biggest concern was the parents' domestic violence and anger management issues. She said that mother had been treated at Didi Hirsch and was seeing a psychiatrist at Kaiser and then weaned herself off the medication. She argued that mother had psychiatric and psychological issues and had chosen not to sign any releases.

Juvenile Court's Ruling

The juvenile court was concerned that mother was sending text messages to father even with a restraining order in place. The juvenile court was also concerned about the violence between the parents. The juvenile court then noted that mother had admitted that she suffered from depression. And, mother had anger management and impulse control issues. Last, the juvenile court was concerned about mother's drug use.

Thus, the juvenile court sustained the following allegations in the section 300 petition on behalf of S.:

Count b-1: Mother and father "have a history of engaging in violent altercations, in the presence of the child. On a prior occasion, the father pushed the mother causing the mother to fall down and to strike the mother's head on a television stand. The mother was unable to protect the child, in that the mother allowed the father to have unlimited access of the child. Such violent conduct on the part of the father against the mother and the mother's inability to protect the child endangers the child's physical health and safety and places the child at risk of physical harm, damage, danger and failure to protect."

Count b-2: Mother "has emotional problems, including Depression, anger [management], impulse control, which periodically renders the mother unable to provide the child with regular care and supervision. On prior occasions, the mother failed to take [her] psychotropic medication as prescribed. The mother's mental and emotional

14

problems endanger the child's physical health and safety and place the child at risk of physical harm and damage."

Count b-3:  Father has mental and emotional problems that render him unable to care for S.

Count b-4:  Father has a history of substance abuse and is a current user of marijuana, which renders him incapable of providing care for S.

Count b-5:  Mother "has a history of periodic substance abuse including methamphetamine and marijuana and is a[n] occasional abuser of alcohol, which renders the mother incapable of providing the child with regular care and supervision.  Such substance abuse by the mother endangers the child's physical health and safety and places the child at risk of physical harm and damage."

Mother was granted monitored visits, with Michael as the monitor, and the matter was set for a disposition hearing.

*Disposition Report*

Mother had weekday monitored visits with S. at the DCFS office.  The visits were appropriate and mother engaged S. in play and was affectionate.  S. missed a couple of visits because she was ill.  Mother also missed visits due to misunderstandings regarding visitation hours, attending father's criminal hearings, and car trouble.

Mother had three Saturday visits with S., however, mother did not comply with the juvenile court's order for the first Saturday visit.  Mother arrived at the exchange site with an unknown male.  Michael was not present.  The dependency investigator explained the rules to mother, and she agreed to abide by them.

On September 16, 2013, the dependency investigator spoke with Dr. Jaffe regarding mother's mental health treatment.  He explained that mother was being treated for depression and attention deficit disorder.  He had prescribed Wellbutrin, Valium, and Adderall for mother's conditions.  The last time mother had refilled the Wellbutrin was in March 2013.  He stated that mother might be refilling her prescriptions elsewhere.  He assumed that mother was taking her mediation as prescribed, but he relied upon mother's

15

self-reporting. He said that mother was not seeing a therapist and that she had last seen a therapist in 2012 for two sessions.

According to the dependency investigator, mother's mental health continued to be a concern because of her history of suicidal ideation and one hospitalization due to her mental health issues. Moreover, mother had made inconsistent statements about her medication, rendering it unclear if mother was taking her medication or weaning herself off of it. DCFS had significant concerns about mother's ability to provide S. with ongoing care and supervision.

Attached to the report were mother's records from Kaiser. On March 26, 2012, mother went for an initial intake for individual psychotherapy at Kaiser with Josephine Lynch, a licensed clinical social worker. Ms. Lynch reported that mother had been in the emergency room due to depression on March 23, 2012. She had had her baby 12 days prior and felt overwhelming sadness for no reason, had bouts of crying, and had feelings of hopelessness. She also was depressed during her pregnancy.

From the ages of 15 to 18 and 21 to 26, mother had been taking Wellbutrin and Adderall. She had been taking Adderall since she was 14 years old. She found Wellbutrin and Adderall to be very helpful, but stopped the medications to see what would happen. She indicated that she felt okay without the Wellbutrin for a few years until she got pregnant. She also was drinking alcohol until she found out that she was pregnant. Mother told Ms. Lynch that it was sometimes "'hard'" for her to stay away from drinking. She noted that her father, paternal grandmother, and her half-siblings were alcoholics.

Ms. Lynch noted that mother's last date of psychiatric hospitalization was when she was 14 years old. She had been prescribed Prozac and Paxil. Her current medical problems included dysthymic disorder, attention deficit hyperactivity disorder, major depression, and alcohol dependence that was in remission.

Mother was prescribed Wellbutrin and Adderall.

On June 19, 2013, mother e-mailed Dr. Jaffe, stating that she was going to stop taking her medication because she was under scrutiny from DCFS. He told mother that

16

she could stop taking the Adderall, but she might want to decrease taking Wellbutrin to one pill a day for a week and then stop.

*Last Minute Information for the Court*

On September 17, 2013, the dependency investigator reported that mother e-mailed her drug test results from Arc Point Labs and that she had tested negative. The lab staff stated that the urine collection sample was not observed and the staff could not explain why mother tested negative for amphetamines if she was taking her prescribed Adderall.

*Disposition Hearing*

At the hearing, S.'s counsel joined with DCFS in requesting that S. be removed from mother's custody, but she requested unmonitored visits between mother and S.

The juvenile court declared S. a juvenile court dependent, under section 300, subdivision (b), and found that a substantial danger existed to her physical health and/or that S. was suffering severe emotional damage and that there were no reasonable means to protect her without removal from her parents' physical custody. Reunification services were ordered. Mother was granted monitored visits and a two-hour weekly unmonitored visit with S.

The six-month review hearing was scheduled for March 20, 2014.

*Appeal*

Mother's timely appeal ensued.

## DISCUSSION

I. *Justiciability*

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence."  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

"[I]t is necessary only for the court to find that one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child. [Citations.]  Once the child is found to be endangered in the manner described by one of the subdivisions of section 300[,] . . . the child comes  within the court's jurisdiction, even if the child was not in the physical custody of one or both parents at the time the jurisdictional events occurred.  [Citation.]  For jurisdictional purposes, it is irrelevant which parent created those circumstances.  A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established.  [Citation.]  As a result, it is commonly said that a jurisdictional finding involving one parent is "'good against both. More accurately, the minor is a dependent if the actions of either parent bring [the minor] within one of the statutory definitions of a dependent.'"  [Citation.]  For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence.  (E.g., *In re Alexis E.*[, *supra*,] 171 Cal.App.4th [at p.] 451 [addressing remaining findings only '[f]or [f]ather's benefit']; *In re Joshua G.* [(2005)] 129 Cal.App.4th [189,] 202 [when a jurisdictional allegation involving one parent is found supported, it is 'irrelevant' whether remaining allegations are supported]; *In re Shelley J.* (1998) 68 Cal.App.4th 322, 330 [declining to address remaining allegations after one allegation found supported], [superseded by statute on other grounds as stated in *In re*

*Christopher C.* (2010) 182 Cal.App.4th 73, 82]; *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72 [same].)" (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491–1492.)

When "issues raised in [an] appeal present no genuine challenge to the court's assumption of dependency jurisdiction[,] . . . any order we enter will have no practical impact on the pending dependency proceeding, thereby precluding a grant of effective relief. For that reason, we find [such an] appeal to be nonjusticiable." (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1491.) "The many aspects of the justiciability doctrine in California were summarized in *Wilson v. L. A. County Civil Service Com.* (1952) 112 Cal.App.2d 450: '"A judicial tribunal ordinarily may consider and determine only an existing controversy, and not a moot question or abstract proposition. . . . [A]s a general rule it is not within the function of the court to act upon or decide a moot question or speculative, theoretical or abstract question or proposition, or a purely academic question, or to give an advisory opinion on such a question or proposition. . . ."' (*Id.* at pp. 452–453.) An important requirement for justiciability is the availability of 'effective' relief— that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status. "'"'It is this court's duty '"to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."'"'"' [Citations.]" (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1490.)

The juvenile court found that it had jurisdiction over S. based on five petition allegations against mother and father under section 300, subdivision (b). Father is not a party to this appeal. Mother's appeal therefore is nonjusticiable. (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1491.)

Mother asks us to consider her appellate contentions because the jurisdictional findings concerning her conduct could affect her in the future. However, she does not "identify any specific potential impact, and we can find none on our own." (*In re I.A.*, *supra*, 201 Cal.App.4th at pp. 1493–1494.) She was awarded visitation and reunification

19

services, and nothing in the juvenile court's order or the dependency statutory scheme prevents mother from seeking and obtaining custody of S.

Our analysis could stop here.

II. *Jurisdictional findings*

For the sake of completeness, we address mother's contention that the juvenile court's jurisdictional findings against her are unsupported by the evidence.

A. Standard of review

As the parties agree, we apply the substantial evidence standard of review. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) Jurisdiction is appropriate under section 300, subdivision (b), where there is substantial evidence that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure to inability of his or her parent or guardian to adequately supervise or protect the child." Three elements must exist for a jurisdictional finding under section 300, subdivision (b): (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "'serious physical harm or illness'" to the child, or a "'substantial risk'" of such harm or illness. (*In re J.O.* (2009) 178 Cal.App.4th 139, 152.)

We may affirm the juvenile court's order made at the jurisdictional stage if substantial evidence supports any one of the counts. (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875–877; *In re Dirk S.* (1993) 14 Cal.App.4th 1037, 1045.)

B. Substantial evidence supports the juvenile court's jurisdictional findings

Ample evidence supports at least two of the juvenile court's jurisdictional findings. First, there is undisputed evidence of domestic violence between mother and father. Exposure to domestic violence may serve as the basis of a jurisdictional finding under section 300, subdivision (b), as children can be put at substantial risk of harm. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194; *In re R.C.* (2012) 210 Cal.App.4th 930, 941; *In re T.V.* (2013) 217 Cal.App.4th 126, 134; *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 562.)

20

In urging us to reverse, mother argues that because father was the perpetrator of the domestic violence, S. should not have been removed from her custody. We cannot agree. While it is commendable that mother obtained a restraining order against father, a restraining order is ineffective unless it is enforced. Here, even though mother obtained a restraining order, she continued to communicate with father, in violation of the restraining order.

Second, there is evidence that mother has a history of substance abuse. After S. was born, mother would get drunk, get sick, vomit, and pass out. On at least one occasion, the paternal grandmother went to pick up S. and found mother passed out in bed, with a ball of marijuana and an empty Jack Daniels bottle. Because of her young age, S. certainly is at substantial risk of harm as a result of mother's drug and alcohol use. (Contra *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1001–1002 [11-year-old minor was old enough to avoid the kinds of physical dangers that make infancy an inherently hazardous period of life].)

III. *Dispositional order*

Mother contends that because the jurisdictional findings are not supported by the evidence, the dispositional order must be reversed. As set forth above, substantial evidence supports the juvenile court's dispositional findings. Thus, this argument fails on appeal.

Alternatively, mother cites sections 301[4] and 360, subdivision (b),[5] and argues that alternative means existed to protect S., short of removing her from mother's custody.

---

[4]     Section 301 permits a program of supervision by a social worker of a child in lieu of filing a section 300 petition or subsequent to dismissal of a section 300 petition.

[5]     Section 360, subdivision (b), provides: "If the court finds that the child is a person described by section 300, it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker for a time period consistent with section 301."

21

As a preliminary matter, this issue has been forfeited on appeal because mother failed to raise it below. (*In re Anthony P.* (1995) 39 Cal.App.4th 635, 641.) Regardless, the juvenile court did not err. Sections 300 and 360, subdivision (b), require mother's cooperation. However, mother's veracity is questionable and she has not been fully cooperative with DCFS. She was not truthful about S.'s alleged examination by a physician and x-rays following her fall at a kiddy pool. She refused to sign a release of information regarding her own mental health records. She tried to have a visit with S. without bringing Michael as required. Under these circumstances, we find no error in the juvenile court's dispositional order. (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474 [abuse of discretion standard of review]; *In re Basilio T.* (1992) 4 Cal.App.4th 155, 169 [substantial evidence standard of review]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [noting that there is no significant difference between these two standards].)

## DISPOSITION

The juvenile court's findings and order are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
　　　　　ASHMANN-GERST


We concur:


_____, P. J.
　　　BOREN


_____, J.
　　　CHAVEZ


22